IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) ) ) | No. 20-CR-4066-LTS-KEM |
| vs. | ) ) | |
| DONALD FRANKLIN TROSIN, | ) ) ) | **GOVERNMENT'S SENTENCING BRIEF** |
| Defendant. | ) ) | |

**TABLE OF CONTENTS**

I.    A TWO-LEVEL INCREASE IS APPROPRIATE FOR SOPHISTICATED LAUNDERING ................................................................... 1

II.   A TWO-LEVEL INCREASE IS APPROPRIATE BECAUSE DEFENDANT OBSTRUCTED JUSTICE ..................................................... 7

III.  THE COURT SHOULD IMPOSE THE RECOMMENDED MENTAL HEALTH CONDITION ...................................................................... 11

IV.   JOINT AND SEVERAL RESTITUTION ...................................................... 11

**I.    A TWO-LEVEL INCREASE IS APPROPRIATE FOR SOPHISTICATED LAUNDERING**

As relevant here, USSG §2S1.1(b)(2)(C) provides for a two-level increase if "the offense involved sophisticated laundering." The commentary to §2S1.1 defines "sophisticated laundering" as "complex or intricate offense conduct pertaining to the execution or concealment of the 18 U.S.C. § 1956 offense." USSG §2S1.1, cmt. (n.5(A)). The commentary states:

> Sophisticated laundering typically involves the use of—

1

>         (i)     fictitious entities
>         (ii)    shell corporations
>         (iii)   two or more levels (i.e., layering) of transactions,
> transportation, transfers, or transmissions, involving criminally
> derived funds that were intended to appear legitimate; or
>         (iv)    offshore financial accounts

*Id.* The listed examples "are illustrative but not required; they are typical but non-exhaustive." *United States v. Fish*, 731 F.3d 277, 280 (3rd Cir. 2018).

The undisputed portions of the Offense Conduct section of the Final Presentence Investigation Report ("PSR") (Doc. 66) make clear that the instant offense was "complex or intricate." Indeed, this offense involved not just one, but all four, of the non-exhaustive examples of sophisticated laundering listed in the Guidelines commentary. Therefore, the Court should apply the "sophisticated laundering" enhancement in this case.

In response the COVID-19 pandemic, Congress passed the Coronavirus Aid, Relief, and Economic Security ("CARES") Act, which authorized hundreds of billions of dollars of emergency financial assistance to the millions of Americans suffering from the pandemic's economic effects. PSR ¶ 11. The emergency assistance included the Paycheck Protection Program ("PPP") and Economic Injury Disaster Loans ("EIDLs"). PSR ¶¶ 11-18.

Defendant participated in a scheme to defraud the United States of these CARES Act funds and then to launder the funds through many layers of individuals, corporations, and financial accounts. The scheme was extensive in scope, complicated and intricate in nature, and extended overseas.

2

Specifically, it was a part of the scheme to defraud that defendant provided his means of identification to others via text message, including his signature and social security number. PSR ¶ 24. A series of false and fraudulent CARES Act loan applications, including a $1.2 million PPP loan and 20 EIDLs, were submitted in defendant's name and in the name of defendant's ex-girlfriend, A.K., without her knowledge or permission. PSR ¶¶ 26, 38. To gain approval, fictitious documents were created and submitted to lenders in the name of defendant and A.K., including a false and fraudulent 2019 IRS Form 944, *Employer's Annual Federal Tax Return*, and a false and fraudulent 2019 Schedule C, Form 1040 or 1040-SR, *Profit or Loss From Business*. PSR ¶¶ 25-26.

With respect to the PPP loan, the fictitious documents purported to show that defendant was regularly receiving large incoming wire transfers for a business from major companies in the United States and paid in excess of $960,000 in payroll expenses during the month of January 2020. PSR ¶ 25. In truth, defendant did not operate a business and had no payroll expenses during that month. *Id.* The paperwork submitted in support of some of the 20 EIDL loans identified a fictitious business entity in A.K.'s name—as a purported sole proprietorship—and bore her fake e-signature. PSR ¶ 26. To cover up the scheme, another individual hired a company to subcontract with another entity to incorporate a phony Minnesota corporation, "Donald Trosin Construction Equipment, LLC," at an address in Albertville, Minnesota. PSR ¶ 28.

3

Defendant received the fraudulent proceeds from the CARES Act loans into two "funnel accounts" that defendant controlled at financial institutions in Minnesota (Wells Fargo Bank) and Iowa (Northwest Bank). PSR ¶¶ 16-26. Defendant then further executed the scheme by "conduct[ing], and attempt[ing] to conduct, a series of smaller financial transactions each in excess of $10,000, to various entities and individuals in other states and countries, including Canada and the People's Republic of China." PSR ¶ 31; Plea Agreement (Doc. 57), ¶ 16(W).

"For example, after receiving $1.2 million in PPP funds into his account at Wells Fargo Bank, the defendant initiated a series of interstate wire transfers to various individuals at different financial institutions." PSR ¶ 32. Specifically, from about May 14, 2020, to about May 19, 2020, the defendant initiated wire transfers in the amounts of $25,000 to the Wells Fargo Bank account of [C.J.] in Arizona, $50,000 to the Republic Bank account of [A.G.] in Pennsylvania, and $200,000 to the Capital One Bank account of DMV Home Services, LLC, in Virginia." *Id.* "Further, on June 11, 2020, the defendant withdrew $300,020 from his account at Wells Fargo Bank to purchase two cashier's checks, each in the amount of $150,000, for an out-of-state limited liability company, NKB Enterprise, LLC, a business owned by Benjamin Sakyi." *Id.*

"Between July 1, 2020, and July 2, 2020, defendant withdrew another $610,000 from his account at Wells Fargo Bank to purchase three additional cashier's checks, in favor of NKB Enterprise, LLC, and Blue Flight Logistics, LLC – both businesses owned by Benjamin Sakyi – in the amounts of $310,000 and two

4

$150,000 checks, respectively." *Id.* "On July 7, 2020, the defendant withdrew $11,000 from his account at Wells Fargo Bank to purchase an $11,000 cashier's check, payable to [A.G.]." *Id.*

"Defendant executed additional interstate wire transfers via his joint account with A.K. held at Northwest Bank." PSR ¶ 33. "Specifically, after receiving the $10,000 EIDL Advance, the defendant initiated a $9,500 wire transfer to the Navy Federal Credit Union account of [M.L.] in Texas." *Id.* "Following the receipt of the additional EIDL funds, a net disbursement amount of $29,900, the defendant initiated an additional $29,800 wire transfer to the Bank of America account of [B.G.] in Georgia." *Id.*

Exhibit 1 is an affidavit from Michael Gentry, an IRS agent, in the related case of *United States v. Benjamin Sakyi*, No. 21-CR-4013 (N.D. Iowa). Exhibit 2 is an excerpt of Agent Gentry's testimony at a detention hearing in that case. These exhibits provide further detail with respect to the laundering of the funds in question. The affidavit details, for example, that Sakyi opened accounts in the name of "NKB Enterprise LLC" and "Blue Flight Logistics LLC" at multiple banks in Virginia shortly before receiving the fraudulent proceeds from defendant. Ex. 1, ¶¶ 19-22. Sakyi then used these accounts to deposit the funds from defendant and then also to funnel the funds elsewhere by various means. *Id.* ¶¶ 40-44, 46. In total, defendant moved over $900,000 to Sakyi via various means and financial accounts, some of which ended up, after further financial transactions, in Ghana and at a company based in Canada. Ex. 2, at 10, 12-13.

5

The probation office concedes that the facts set forth in the PSR disclose an offense that is intricate and complex and involves fictitious entities, shell corporations, two or more levels of transactions, and offshore financial accounts. PSR ¶ 43, Resp. to Obj. No. 8. However, the probation office characterizes these facts as part of "the larger offense conduct" and declines to score the two-level enhancement for sophisticated laundering because "defendant's own conduct was not 'sophisticated.'" *Id.*

There is no legal basis for distinguishing between "the larger offense conduct" and "defendant's offense" in this case. Section 2S1.1 simply asks whether "the offense involved sophisticated money laundering," much like §2K2.1 inquires whether the offense involves a destructive device or a stolen firearm. Of course, under the doctrine of relevant conduct, defendant is not only responsible for his own actions but he is also responsible for the reasonably foreseeable acts of others, whether or not charged as a conspiracy. *See* USSG ¶1B1.3. In this case, of course, defendant has himself pled guilty to money laundering conspiracy, so it was foreseeable to him that the persons to which he was sending fraud proceeds by various means would do the same. That is particularly true when defendant was doing much more than making a few financial transactions with fraud proceeds as one might find in a garden-variety money laundering case—to the contrary, defendant received over $1 million in fraud proceeds at two bank accounts in two states and then sent or attempted to send the proceeds of the fraud to multiple persons and entities in many states and to China. The fact defendant acted at the

6

Case 5:20-cr-04066-LTS-KEM   Document 71-1   Filed 07/06/21   Page 6 of 13

direction of another person and did not himself execute all of the financial transactions does not change the analysis.

The government would emphasize that the "sophisticated laundering" enhancement in USSG §2S1.1 is worded differently than the "sophisticated means" enhancement in USSG §2B1.1. Section 2B1.1(b)(10) not only requires proof that the offense involves sophisticated means but also proof that "the defendant intentionally engaged in or caused the conduct constituting sophisticated means." Section 2S1.1 contains no similar requirement of proof for "sophisticated laundering."[1]

Accordingly, the Court should apply the two-level enhancement for "sophisticated laundering" in §2S1.1 in this case.

## II. A TWO-LEVEL INCREASE IS APPROPRIATE BECAUSE DEFENDANT OBSTRUCTED JUSTICE

On July 31, 2020, law enforcement attempted to interview defendant about the scheme at the home of defendant's son, J.T., in Ringstead, Iowa. PSR ¶ 34; Exhibit 4. Defendant's son, J.T., was present during the attempted interview but falsely stated that defendant was not there. Exhibit 4. On August 27, 2020,

---

[1] The Commission added the additional requirement to §2B1.1's "sophisticated means" provision in 2015 but conspicuously did not make a similar amendment to §2S1.1's "sophisticated laundering" provision. *See* USSG §2B1.1(b)(10)(C), amend. 792, Supplement to App. C. (effective Nov. 1, 2015). Even so, the sophisticated means enhancement is not limited to the mastermind of the scheme. *See United States v. Muresanu*, 951 F.3d 833, 840 (7th Cir. 2020) (the "enhancement applies when the defendant 'engaged in' or 'caused' the relevant conduct … using sophisticated means[,]" and is not limited to the "mastermind" behind the scheme).

defendant was arrested on a warrant for the instant offense after surrendering to the USMS at the United States Courthouse in Sioux City.  PSR ¶ 2.

The PSR discloses—and it is undisputed—that within weeks of his arrest defendant executed a quit claim deed in favor of his son on September 18, 2020. PSR p.27, n.8; Exhibit 3.  By that quitclaim deed, defendant transferred defendant's property located on Third Avenue in Armstrong, Iowa, to his son.  *Id*.  The value of the property is valued at $19,800.  *Id*.  No transfer tax was paid on the quitclaim deed, because the deed itself states that there was "no consideration" for the transfer between parent and child.  Exhibit 3; Iowa Code § 482A.2(11).

This quitclaimed property was defendant's largest asset, and he now has a negative net worth of $18,967.12.  PSR ¶ 87.  Defendant presently represents himself to the Court at sentencing as essentially "judgment proof" and unable to pay a fine.  PSR ¶ 88.

Section 3C1.1 of the advisory Sentencing Guidelines provides for a two-level increase if a defendant obstructs or impedes justice, or attempts to obstruct or impede justice.  The circuit courts of appeals have held that obstruction of justice for purposes of USSG §3C1.1 may include transferring assets to a relative to avoid collection.  *United States v. Craft*, 478 F.3d 899, 901 (8th Cir. 2007); *United States v. Jackson-Randolph*, 282 F.3d 369, 390 (6th Cir. 2002); *United States v. Keeling*, 235 F.3d 533, 536 (10th Cir. 2000).

The probation office does not recommend the enhancement on the ground that there is "no evidence to suggest that the defendant's noted transfer of property

8

via quitclaim deed was 'fraudulent'"; defendant disclosed the transfer in his presence interview; and *Jackson-Randolph* and *Keeling* are not precedential and "the most recent case was heard approximately 19 years ago." PSR ¶ 46, Response to Obj. No. 9. These reasons for not applying the enhancement do not withstand scrutiny.

*First*, the Court may infer from the circumstances that the quitclaim deed was a fraudulent transfer amounting to an attempt to obstruct the administration of justice, that is, the government's ability to collect restitution. Here, both parties to the transaction were aware of the investigation into defendant, and the quitclaim deed was effectuated less than a month after defendant's arrest. Although defendant is not himself an attorney, of course, the Court may readily infer from these circumstances that defendant knew he would be required to pay restitution in the event of conviction and used the quitclaim deed as a way to frustrate the government's efforts to attach a lien to defendant's primary asset so that proceeds from any future sale of the property might be applied towards defendant's restitution obligation. That is especially true where, as here, there was no consideration for the transfer. *See, e.g., Ritchie Capital Mgmt, LLC v. Stoebner*, 779 F.3d 857, 863 (8th Cir. 2015) (considering the "[p]erhaps most salient fact" in a fraudulent transfer analysis to be the fact that the transferor received "no value in exchange" for the transaction).

The foregoing analysis is similar to the fraudulent transfer context in bankruptcy. In the fraudulent transfers context, the Eighth Circuit Court of

9

Appeals has recognized that "direct evidence of fraud is rare" and "a court in most instances can only infer fraud by considering circumstantial evidence." *Ritchie*, 779 F.3d at 863 (quoting *In re Sholdan*, 217 F.3d 1006, 1008 (8th Cir. 2000)). Therefore, once badges of fraud are shown through circumstantial evidence, a party attacking a transfer as fraudulent may be entitled to a presumption of fraudulent intent on the part of the transferor, and the transferor should have to come forward with "some legitimate supervening purpose for the transfers at issue." *Id.* (quoting *Kelly v. Armstrong*, 141 F.3d 799, 802 (8th Cir. 1998)). In this case, defendant has offered no reason or justification for the transfer of his chief asset to his son for no consideration, and so the Court may infer from the circumstances that he acted with fraudulent intent.

*Second*, the fact defendant disclosed the transfer in his presentence interview should not preclude the Court from finding that defendant obstructed justice by fraudulently transferring his chief asset to his son without consideration. To be sure, had defendant made a false statement to the probation office about his assets and transfers, that additional false statement, in itself, would have been an independently sufficient ground for applying the obstruction of justice enhancement. USSG §3C1.1, cmt. n.4(h). Rather, it is because defendant has admitted he made the transfer that the government has not objected to defendant receiving a reduction for acceptance of responsibility under USSG §3E1.1.

*Third*, nothing prevents the Court from relying on persuasive cases from other circuit courts of appeals. The government does not suggest that *Jackson-*

10

*Randolph* and *Keeling* are binding on this Court. The reasoning of those cases stand on their own merits and, to the extent the Court finds them persuasive, the Court may rely on them here.

Accordingly, the Court should apply the two-level enhancement for obstruction under USSG §3C1.1.

### III. THE COURT SHOULD IMPOSE THE RECOMMENDED MENTAL HEALTH CONDITION

The government agrees that the Court should impose the requested mental health condition for the reasons the probation office identifies in Paragraph 104 of the PSR. The government would point out that defendant has not objected to making the underlying statement at issue in Paragraph 37, which led to the probation office recommending the special condition.

### IV. JOINT AND SEVERAL RESTITUTION

Defendant argues his restitution obligation "should be joint and several" with certain individuals presently under indictment in the United States District Court for the Southern District of New York in Case No. 21-CR-88. Defendant notes that the individuals in the Southern District of New York are charged with a series of frauds emanating from West Africa and at least one of those individuals received some of the fraudulent proceeds that defendant received and laundered to Sakyi.

The pending case in the Southern District of New York results from a separate investigation. The publicly filed indictment in that case alleges a scheme to defraud that began in 2013 and continued to 2020 and involves a wide-ranging fraud that appears to be broader in scope, both in nature and temporally, than the

11

CARES Act fraud and money laundering scheme to which defendant has pled guilty in this case.

The undersigned cannot find any legal authority discussing the precise issue at hand, *i.e.*, whether the Court may impose a restitution obligation jointly and severally with a hypothetical conviction in the future in another separate case that may turn out to present some overlap in the restitution obligations of various sentenced individuals. Although the undersigned does not believe the practice of conditional restitution orders prevails in this district based on past experience, in *United States v. Guillermo*, No. CR 13-55-DMG, 2016 WL 5852851, at *1 (C.D. Cal. Oct. 3, 2016), the judgment order reflects that a California district court entered a conditional restitution order with respect to a co-defendant. The California district court employed the following language, "The defendant shall be held jointly and severally liable with co-defendant Marilyn Agaton, if convicted, for the amount of restitution ordered in this judgment."). The serious difficulty in the present case, of course, is that unlike *Guillermo* the defendants in the Southern District of New York are not defendant's co-defendants. Therefore, at present, it would appear to the government to be the better course to not make defendant's requested conditional restitution order at this time, because (1) it is not certain whether any of the defendants in the Southern District of New York will be convicted and (2) even in the event of conviction of one or more of the Southern District of New York defendants, it is unclear to what extent there would be any overlap in the

12

restitution obligation imposed in New York with defendant's restitution obligation in this case.

          Respectfully submitted,

          SEAN R. BERRY
          Acting United States Attorney

          By, /s/ *Timothy L. Vavricek*

          TIMOTHY L. VAVRICEK
          Assistant United States Attorney
          111 Seventh Avenue, SE, Box 1
          Cedar Rapids, IA 52401
          319-363-6333
          319-363-1990 (Fax)
          Tim.Vavricek@usdoj.gov