# UNITED STATES DISTRICT COURT
for the
Northern District of Iowa

| | |
|---|---|
| United States of America<br>v.<br><br>Benjamin Sakyi,<br><br>*Defendant(s)* | )<br>)<br>)  Case No. 21-CR-4013<br>)<br>)<br>)<br>) |

**Government Exhibit 1**
Case 20-CR-4066-LTS

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of  no later than May 2020, through at least July 2020, in the county of  Clay  in the  Northern  District of  Iowa , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1956(h) | Money Laundering Conspiracy |

This criminal complaint is based on these facts:

See Attached Affidavit.

☑ Continued on the attached sheet.

*Complainant's signature*

Michael Gentry, Jr., IRS-CI Special Agent
*Printed name and title*

☐ Sworn to before me and signed in my presence.

☑ Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone or other reliable electronic means.

Date: January 28, 2021

*Judge's signature*

Northern District of Iowa

KELLY K.E. MAHONEY, Chief U.S. Magistrate Judge
*Printed name and title*

# AFFIDAVIT

1. I, Michael Gentry, Jr., being first duly sworn, on oath depose and state that I am a Special Agent with the Internal Revenue Service-Criminal Investigation (IRS-CI) and have been since June 2014.

2. As part of my duties as a Special Agent, I conduct financial investigations related to various violations of the United States Code. I am authorized to apply for and execute search warrants and arrest warrants for offenses enumerated in Title 18 of the United States Code. I have participated in and directed investigations involving various types of criminal activity and, as a result of my training and experience, I am familiar with the tactics, methods, and techniques of committing various types of fraud-related violations of federal law.

3. The information in this affidavit is based upon my personal knowledge as well as information learned from other law enforcement agencies, investigators, witnesses, and documents. The facts set forth in this affidavit are based on my personal knowledge and information from others, including law enforcement officers involved in this case, through interviews and reviews of loan documents, electronic files, emails, and other records and files related to this investigation.

4. This affidavit is submitted for the purpose of establishing probable cause in support of an application to arrest BENJAMIN SAKYI (Sakyi) for a violation of Title 18, United States Code, Section 1956(h) (Money Laundering

Conspiracy). Based on the investigation conducted as to the information contained within this affidavit, I submit there is probable cause to believe that Sakyi has acted with his co-conspirators to launder the proceeds obtained from a specified unlawful activity, wire fraud, 18 U.S.C. § 1343, in violation of 18 U.S.C. §§ 1956 and 1957. Sakyi has knowingly conducted financial transactions involving the proceeds of wire fraud, with the intent to promote the wire fraud activity or used the transaction to conceal or disguise the true nature, location, source, ownership or control of the wire fraud proceeds, in violation of 18 U.S.C. § 1956(a)(1)(A)(i) and (B)(i). In addition, Sakyi knowingly engaged in monetary transactions in criminally derived property of a value of more than $10,000, in violation of 18 U.S.C. § 1957(a).

5. This affidavit contains only a summary of certain facts. Since this affidavit is being submitted for the limited purpose of supporting an application for an arrest warrant, I have not included each and every fact known to me concerning this investigation, but I have set forth only those facts necessary to establish probable cause. Further, where statements of others are set forth in this affidavit, they are set forth in substance and not verbatim, unless specifically indicated otherwise.

## BACKGROUND

6. Coronavirus Aid, Relief, and Economic Security ("CARES") Act is a federal law enacted in late March 2020 that provides emergency financial assistance to the millions of Americans who are suffering the economic effects of the COVID-19

pandemic. The Small Business Administration (SBA) administers certain financial assistance programs under the CARES Act.

### *The Paycheck Protection Program*

7. One form of CARES Act financial assistance is the authorization of up to $349 billion in forgivable loans to small businesses for job retention and certain other expenses, through a program referred to as the Paycheck Protection Program ("PPP"). Later, in April 2020, Congress authorized an additional $300 billion in PPP funding.

8. In order to obtain a PPP loan, a business submits a PPP loan application (SBA Form 2483), which must be signed by an authorized representative of the business. The loan application requires the business, through its authorized representative, to acknowledge the PPP program rules and to make certain affirmative certifications regarding its eligibility. In the application, the small business's authorized representative must also provide, among other things, the business's average monthly payroll expenses and number of employees. These figures are used to calculate the business's eligibility and the amount of money it may receive under the PPP. In addition, businesses applying for a PPP loan must provide documentation showing their payroll expenses.

9. A PPP loan application must be processed by a participating lending financial institution. If a PPP loan application is approved by the participating financial institution, that institution funds the PPP loan using its own monies, which are 100% guaranteed by the SBA. Participating financial institutions require

that the information provided in PPP loan applications be truthful, including information about the applicant business's employees and payroll expenses, which is material to the financial institution's approval and the terms of the PPP loans.

10. Information from the application, including information about the borrower, the total amount of the loan, and the listed number of employees, is transmitted on behalf of the applicant by the lending financial institution to the SBA in the course of processing the loan.

11. PPP loan proceeds must be used by the business for certain permissible expenses – payroll costs, interest on mortgages, rent, and utilities. The PPP allows the principal and interest on the PPP loan to be entirely forgiven if the business spends the loan proceeds on these items within a designated period of time, usually within twenty-four weeks of receiving the proceeds, and if the business also uses at least 60% of the PPP loan proceeds for payroll expenses.

*Economic Injury Disaster Loans*

12. The SBA's Economic Injury Disaster Loan ("EIDL") is a working capital loan that is available to small businesses. Eligible recipients may include small agricultural businesses, certain private non-profit organizations, faith-based organizations, and houses of worship, sole proprietors, independent contractors, and owners of rental property.

13. Unlike the PPP, EIDL applicants do not apply through a participating financial institution, but instead apply directly to the SBA's Disaster

Assistance Program.  Further, EIDL loans may be used to pay fixed debts, payroll, accounts payable, and other bills that could have been paid had the disaster not occurred.

14. The EIDL Advance ("the Advance") is for any entity that is eligible to apply for a COVID-19 EIDL.  COVID-19 EIDL applicants may request to be considered for an advance of up to $10,000.  The disbursement amount will be determined by the number of the small business's employees before the COVID-19 disaster (i.e., as of January 31, 2020).  The Advance will provide the EIDL applicant with $1,000 per pre-disaster employee, up to a maximum of $10,000.

## THE SBA-LOAN FRAUD SCHEME

15. There is probable cause to believe that Donald Trosin,[1] Benjamin Sakyi, and others have been involved in a fraudulent scheme to obtain and launder SBA loan moneys by means of wire fraud (and other federal crimes, including mail fraud).  As described below in more detail, it was part of the scheme that Trosin fraudulently received and transmitted SBA loan moneys, to which he was not entitled, to Sakyi and others.  Sakyi then used accounts at three financial institutions, Bank-8, Bank-9, and Bank-10, to receive the fraud proceeds from Trosin and also to withdraw the fraud proceeds in the form of cashier's checks payable to one or more other individuals involved in the fraudulent scheme.

16. At all relevant times, Sakyi maintained accounts at Bank-8, Bank-9, and

---

[1] Donald Trosin is presently charged with Wire Fraud in violation of 18 U.S.C. § 1343 in Case No. 20-CR-4066-LTS-KEM.

Bank-10. The deposits of Bank-8 and Bank-9 are each insured by the Federal Deposit Insurance Corporation (FDIC). The deposits of Bank-10 are insured by the National Credit Union Administration (NCUA). Bank-1 is a national bank with branches throughout the United States, including within the Northern District of Iowa. Bank-2 is based in Spencer, Iowa, within the Northern District of Iowa, and has locations in Iowa and Nebraska. As detailed below, Donald Trosin would use Bank-1 and Bank-2 to transfer fraud proceeds to accounts that Sakyi controlled at Bank-8, Bank-9, and Bank-10.

17. On July 19, 2018, Articles of Organization for Blue Flight Logistics LLC were filed with the State of Virginia Secretary of State. The Articles of Organization listed the initial registered agent as Benjamin Sakyi and the principal office where the records of the limited liability company are to be kept as XX Town Square Circle #YYY, Stafford, Virginia.

18. On December 19, 2019, Articles of Organization for NKB Enterprise LLC were filed with the State of Virginia Secretary of State. The Articles of Organization listed the principal office at an address in Dumfries, Virginia, the same address listed on Sakyi's State of Virginia driver's license.

19. On May 27, 2020, Sakyi opened an account ending in 7672 in the name of NKB Enterprise LLC (NKB) at Bank-8, as the sole owner of the account. Sakyi provided a passport from Ghana, a Social Security Number, and listed a mailing address for the account in Dumfries, Virginia.

20. On June 30, 2020, Sakyi opened an account ending in 7508 in the name of NKB

at Bank-9, as the sole owner of the account. Sakyi provided a State of Virginia Driver's License and listed a mailing address for the account in Dumfries, Virginia.

21. On July 6, 2020, Sakyi opened an account ending 9408 in the name of Blue Flight Logistics LLC (Blue Flight) at Bank-10, as the sole owner of the account. Sakyi provided a passport from Ghana and listed a mailing address in Dumfries, Virginia.

22. In summary, Sakyi had the following accounts:

| Name | Entity | Last Four Digits of Account Number | Bank |
| --- | --- | --- | --- |
| Sakyi | Blue Flight | 9408 | Bank-10 |
| Sakyi | NKB | 7672 | Bank-8 |
| Sakyi | NKB | 7598 | Bank-9 |

### *Trosin's PPP Loan*

23. On or about May 13, 2020, a SBA Form 2483 was completed and submitted for the benefit of a participating financial institution within the SBA's PPP program for the "Business Legal Name" of "Donald Trosin," purportedly signed by Donald Trosin, listing Donald Trosin's Social Security Number (SSN) as both Donald Trosin's SSN and as the business taxpayer identification number (TIN). The SBA Form 2483 stated Donald Trosin's business had 120 employees on its payroll. Donald Trosin was listed as owing 100% of the business.

24. In the SBA Form 2483, again purportedly signed by Donald Trosin, the applicant certified, "All SBA proceeds will be used only for business-related

purposes as specified in the loan application and consistent with the Paycheck Protection Program Rule." Further, the applicant certified, "The Applicant was in operation on February 15, 2020, and had employees for whom it paid salaries and payroll taxes or paid independent contractors, as reported on Form(s) 1099-MISC. The applicant also certified, "The funds will be used to retain workers and maintain payroll or make mortgage interest payments, lease payments, and utility payments, as specified under the Paycheck Protection Program Rule; I understand that if the funds are knowingly used for unauthorized purposes, the federal government may hold me legally liable, such as for charges of fraud." The SBA Form 2483 included a phone number of (978) YYY-4434 and an email address of businessbiz2020@XXXXX.com.

25. In conjunction with this PPP loan application, Internal Revenue Service (IRS) documents and a monthly bank statement from Donald Trosin's account at Bank-1 were submitted as purported verification of the representations in the SBA Form 2483.

26. Specifically, an IRS Form 944, Employer's Annual Federal Tax Return for 2019, listed total compensation for "Donald Trosin" in the amount of $5,800,000.00. Further Schedule C, Form 1040 or 1040-SR, Profit or Loss From Business for 2019, indicated wages of $5,760,000.00. The monthly bank statement, variously dated February 12 and 13, 2020, purports to show that Donald Trosin was regularly receiving large incoming wire transfers from major companies in the United States and, on January 14, 2020, expended

$480,356.00 in payroll for the January 1 through January 14, 2020 pay period, and then expended $480,356.00 in payroll for the January 14 through January 28, 2020 pay period.

27. According to the Minnesota Secretary of State website, Donald Trosin Construction Equipment, LLC, was not incorporated until May 26, 2020, with a registered office in Albertsville, Minnesota. The Minnesota Department of Employment and Economic Development indicates, "No Employer Tax Account results were found for Donald Trosin Construction Equipment."

28. The government has obtained Donald Trosin's true and correct monthly bank statement dated February 12, 2020 from Bank-1. Comparing the true and correct statement received from Bank-1 with the statement submitted in conjunction with Donald Trosin's PPP loan, it appears someone altered Donald Trosin's actual monthly statement to add the entries about incoming wire transfer and payroll, described above. Donald Trosin's true and correct monthly bank statement does not contain any entries for payroll to other individuals.

29. Donald Trosin has stated to law enforcement he did not prepare or file the SBA Form 2483. Trosin stated he provided his personal identifying information to Individual-1, a person he met on a dating website. Trosin provided his social security number around April 23, 2020, via text message to Individual-1 at phone number (571) YYY-1672. On April 25, 2020, Individual-1 sent text messages to Trosin stating Trosin's phone number was given to a buyer, the
9

buyer works with the SBA, and the buyer's name is Individual-2. On May 8, 2020, Individual-1 provided instructions via text message to Trosin to wire money to Individual-4. On May 14, 2020, Individual-1 sent a text message to Trosin stating $1.2 million was coming into his bank account. On May 14, 2020, Individual-1 provided instructions to Trosin via text messages to wire money to Individual-5 and Individual-14. On May 15, 2020, Individual-1 sent a text message to Trosin saying his account at Bank-2 will have $30,000 in the account. On May 15, 2020, Trosin replied via text message to Individual-1 that "there is 29900 in there [Individual-2] wants 29800 sent." On May 15, 2020, Individual-1 sent text messages to Trosin with instructions to wire money to Individual-7 at Bank-1 and Individual-8 at Bank-6. On May 18, 2020, Individual-1 sent text messages to Trosin with instructions wire money to Company-2 at Bank-7. Trosin stated Individual-2 and Individual-3 also provided instructions to him on where to wire money.

### *The EIDL Loans*

30. There have been approximately 20 EIDL applications, submitted to SBA, that appear related to Donald Trosin in some manner. One of the applications is in the name of Individual-6, a resident of the Northern District of Iowa and Trosin's former live-in girlfriend.

31. On or about May 5, 2020, an EIDL application was filed in the name of Individual-6. The application indicated the entity was a "Sole Proprietorship" established November 30, 2017, in the agriculture industry, with 11

employees. The agreed-upon amount of the loan was $30,000.00, less a $100.00 filing fee, with a net disbursement amount of $29,900.00 to the account ending in 8387 held jointly by Individual-6 and Donald Trosin at Bank-2, located in the Northern District of Iowa. On or about May 7, 2020, an EIDL Advance for this loan was wired from the SBA to Bank-2 in the amount of $10,000.00. On or about May 13, 2020, a Loan Agreement, Note, and Related Documents were e-signed, purportedly by Individual-6. On or about May 15, 2020, EIDL loan proceeds were sent via wire to the Bank-2 account in the amount of $29,900.00.

32. Individual-6 has indicated to a law enforcement officer that she did not apply for any SBA loans.

33. On or about May 7, 2020, an EIDL application was filed in the name of Donald Trosin. The application stated the entity was a "Sole Proprietorship" established January 1, 2016, in the agriculture industry, with 15 employees. The agreed-upon amount of the loan was $150,000.00 less a $100.00 filing fee, with a net disbursement amount of $149,900.00 to the account ending in 8387 held jointly by Individual-6 and Donald Trosin at Bank-2. On or about May 19, 2020, EIDL loan proceeds were sent via wire to the Bank-2 account in the amount of $149,900.00.

34. Trosin has indicated to law enforcement that he has never had any employees.

**TROSIN'S FINANCIAL TRANSACTIONS WITH FRAUD PROCEEDS**

35. On May 8, 2020, Donald Trosin initiated a wire transfer in the amount of $9,500.00 from his joint account with Individual-6 ending in 8387 at Bank-2 to

Individual-4 at Bank-3 in San Antonio, Texas. On May 18, 2020, Donald Trosin initiated a wire transfer in the amount of $29,800 from his joint account with Individual 6 at Bank-2 to Individual-5 at Bank-4 in Kennesaw, Georgia. The wire included the statement, "God wins."

36. On or about May 14, 2020, Donald Trosin received a deposit of $1,200,000.00 from "Crb Bluevine Sba Loan Donald Trosin" into his account at Bank-1. These funds represented the proceeds of the PPP loan that was disbursed based upon the representations in the Form 2483 described above.

37. Records obtained from Bank-1 reveal that, after receiving the $1,200,000.00 into Donald Trosin's account at Bank-1, Donald Trosin initiated a series of wire transfers to various individuals at different banks throughout the United States. On May 15, 2020, Donald Trosin initiated a wire transfer in the amount of $25,000.00 from his account at Bank-1 to Individual-7 at Bank-1 in Phoenix, Arizona. On May 15, 2020, Donald Trosin initiated a wire transfer in the amount of $50,000.00 from his account at Bank-1 to Indiviudal-8 at Bank-6. On May 19, 2020, Donald Trosin initiated a wire transfer in the amount of $200,000.00 from his account at Bank-1 to Company-2 at Bank-7. In addition:

   a. On June 11, 2020, Trosin withdrew $300,020.00 from his account at Bank-1 to purchase two cashier's checks, each in the amount of $150,000.00, each payable to NKB;

   b. On July 1, 2020, Trosin withdrew $310,010.00 from his account at Bank-1 to purchase a $310,000.00 cashier's check payable to NKB; and

    c. On July 2, 2020, Trosin withdrew $300,000.00 from his account at Bank-1 to purchase two cashier's checks, each in the amount of $150,000.00, each payable to Blue Flight.

38. On May 20, 2020, Company-2 withdrew $170,000.00 to purchase a cashier's check payable to Company-3.

39. Trosin has admitted to law enforcement that, after withdrawing moneys in the form of cashier's checks as described above, Trosin then mailed these cashier's checks to others.

## SAKYI FINANCIAL TRANSACTIONS WITH FRAUD PROCEEDS
### *Bank-8*

40. On June 12, 2020, Sakyi deposited a $150,000.00 cashier's check payable to NKB into its account at Bank-8. On June 15, 2020, Sakyi deposited a second $150,000.00 cashier's check payable to NKB into Bank-8. These two cashier's checks were purchased on June 11, 2020, by Trosin, as identified above.

41. Sakyi then made a series of withdrawals from NKB's account at Bank-8. On June 15, 2020, Sakyi purchased two $9,000.00 cashier's checks payable to Company-3. On June 18, 2020, Sakyi withdrew $32,216.00 to purchase a $8,963.00 cashier's check payable to Company-4; a $3,023.00 cashier's check payable to Company-4; a $10,000.00 cashier's check payable to Company-5; and a $10,100.00 cashier's check payable to Individual-9. On June 26, 2020, Sakyi withdrew $109,895.00 to purchase a $109,895.00 cashier's check payable to Company-6. On June 26, 2020, Sakyi withdrew $121,413.00 to purchase a $4,550.00 cashier's check payable to Company-7; a $18,500.00 cashier's check

payable to Company-5; a $20,000.00 cashier's check payable to Individual-10; a $40,000.00 cashier's check payable to Company-3; a $10,300.00 cashier's check payable to Individual-11; and a $28,063.00 cashier's check payable to Individual-11. On June 29, 2020, Sakyi withdrew $53,010.00 to purchase a $53,000.00 cashier's check payable to Company-6.

### *Bank-9*

42. On July 3, 2020, Sakyi deposited a $310,000.00 cashier's check payable to NKB into Bank-9. The cashier's check was purchased on July 1, 2020, by Trosin, as identified above.

43. Sakyi then made a series of withdrawals from NKB's account at Bank-9. On July 16, 2020, Sakyi purchased a $263,500.00 cashier check payable to Company-6. On July 17, 2020, Sakyi purchased a $20,000.00 cashier's check payable to Individual-12; a $15,000.00 cashier's check payable to Company-4; and a $10,000.00 cashier's check payable to Company-8.

### *Bank-10*

44. On July 6, 2020, Sakyi deposited two cashier's checks each in the amount of $150,000.00 payable to Blue Flight into its account at Bank-10. The cashier's checks were purchased on July 2, 2020, by Trosin, as identified above. Using most of this $300,000, on July 17, 2020, Sakyi purchased cashier's checks in the amounts of $8,008.00 to Company-4; $240,832.00 to Company-6; and $23,160.00 to Individual-13.

45. In August 2020, Sakyi spoke with Individual-15, an employee with Bank-10,

about the source of funds Sakyi had deposited in Bank-10. Sakyi told Individual-15 he did not know the name of the person he received the money from off the top of his head. Sakyi looked up the name and said the source of the money was Donald Trosin. Sakyi said he was referred to Donald Trosin, and Trosin was lending him money for his business, Blue Flight Logistics.

46. In summary, Sakyi committed the following transactions with fraud proceeds:

| Name | Entity | Last Four Digits of Account | Bank | Deposit Date(s) and Amount(s) | Cashier's Check(s) Purchased and Date(s) |
|---|---|---|---|---|---|
| Sakyi | Blue Flight | Act 9408 | Bank-10 | 7/6 Deposit $300,000 DT cc | 7/17 $8,008; $240,832; $23,160 cc |
| Sakyi | NKB | Act 7672 | Bank-8 | 6/12 Deposit $150,000 DT cc  6/15 Deposit $150,000 DT cc | 6/15 $9,000; $9,000 cc  6/18 $8,963; $3,023; $10,000; $10,100 cc  6/26 $109,895 cc  6/26 $4,550; $18,500; $20,000; $40,000; $10,300; $28,063 cc  6/29 $53,000 cc |
| Sakyi | NKB | Act 7598 | Bank-9 | 7/3 Deposit $310,000 DT cc | 7/16 $263,500 cc  7/17 $20,000; $15,000, $10,000 cc |

47. Based on my training and experience, the transactions listed in the foregoing

table indicate that Sakyi was engaged in money laundering in violation of 18 U.S.C. §§ 1956 and 1957. For example, the table shows Sakyi deposited two cashier's checks in the amount of $150,000 each into the account of Blue Flight at Bank-10 on July 6, 2020. This deposit is a monetary transaction as defined by 18 U.S.C. § 1957(f)(1) in an amount greater than $10,000 of proceeds derived from the wire fraud, a specified unlawful activity as defined by 18 U.S.C. § 1956(c)(6). The money in the two cashiers' checks came from the proceeds of the loan obtained fraudulently by wire fraud as indicated above.

## CONCLUSION

48. Based on the foregoing, my knowledge, training and experience, I respectfully submit there is probable cause to believe Sakyi has committed a violation of Title 18, United States Code, Section 1956(h) (Money Laundering Conspiracy), in that he and at least one other individual entered into an agreement from no later than May 2020, through at least July 2020, to commit money laundering under both sections 1956 and 1957 by fraudulently obtaining loan proceeds and engaged in financial transactions with those proceeds in amounts less than $10,000 and greater than $10,000 in order to conceal the nature, source, location, ownership and control of the proceeds. In fact, each time Sakyi engaged in any monetary transaction in an amount greater than $10,000 where the proceeds involved money from the fraud, Sakyi violated 18 U.S.C. § 1957. Each of these financial transactions were conducted with the proceeds of the wire fraud and were done with the intent to conceal or disguise the true

nature, location, source, ownership or control of the wire fraud proceeds by moving the money from Trosin and the bank account where the PPP loan was distributed. Further, these transactions were conducted to promote the ongoing wire fraud by paying participants their cut of the proceeds or to encourage further participation.

I declare under penalty of perjury the foregoing is true and correct.

*Michael Gentry, Jr.*
Michael Gentry, Jr.
Special Agent
Internal Revenue Service
Criminal Investigation

Subscribed and sworn to me by phone and other reliable electronic means this 28th day of January, 2021.

*Kelly K.E. Mahoney*
KELLY K.E. MAHONEY
Chief United States Magistrate Judge
Northern District of Iowa